UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| THE FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR AMERICAN MARINE BANK,<br><br>Plaintiff,<br><br>v.<br><br>REX TOWNSEND, BARBARA KAYE, RENZO LUCIONI, GARY WINTER, BESS ALPAUGH, CARL BERG, JEFFREY GOLLER, THOMAS KILBANE, ANDREW MUELLER, and ALICE TAWRESEY,<br><br>Defendants. | NO.<br><br>COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS NEGLIGENCE AND NEGLIGENCE<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Federal Deposit Insurance Corporation, as Receiver ("FDIC-R") for American Marine Bank ("AMB") (collectively, "Plaintiff"), sues Rex Townsend, Barbara Kaye, Renzo Lucioni, Gary Winter, Bess Alpaugh, Carl Berg, Jeffrey Goller, Thomas Kilbane, Andrew Mueller, and Alice Tawresey (collectively, "Defendants") for breach of fiduciary duty, gross negligence, and negligence, and alleges as follows:



*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

I.

**INTRODUCTION**

1. On January 29, 2010, AMB was closed and the FDIC-R was appointed as receiver pursuant to 12 U.S.C. § 1821(c). At that time, the FDIC-R succeeded to all the rights, titles, and privileges of AMB and its depositors, account holders, other creditors, and stockholders. 12 U.S.C. § 1821(d)(2)(A)(i). The loss to the Deposit Insurance Fund as a result of the failure of AMB is currently estimated at $61 million.

2. Defendants, 10 of AMB's former directors and/or officers, caused damages by failing to approve loans in the manner required under the applicable loan policies and by approving loans that did not warrant approval. Collectively, the Defendants were charged with, among other responsibilities, the responsibility of operating and managing the lending function of AMB. But, rather than manage AMB's lending function in a safe, sound and reasonable manner, the Defendants took unreasonable risks with the Bank's loan portfolio; allowed irresponsible and unsustainable rapid asset growth concentrated in high-risk and speculative acquisition, development and construction ("ADC"), and commercial real estate ("CRE") loans, disregarding regulator advice and criticisms regarding lending activities; and violated AMB's loan policies and reasonable industry standards.

3. By repeatedly ignoring loan policy violations that would have been apparent had even scant attention been paid to the underwriting files, and by approving loans that violated the Bank's written loan policies, the Defendants sued herein breached their fiduciary duties, were grossly negligent, and negligent.

4. In committing numerous breaches of their duties, the Defendants demonstrated a want of slight care under the circumstances known to them at the time, and otherwise abdicated their corporate responsibilities by closing their eyes to known risks.

5. The Defendants' breaches of fiduciary duties, gross negligence, and negligence caused damages to AMB of no less than $18 million based on 11 example loans — two insider



Law Offices
KARR·TUTTLE·CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

loans, three CRE loans, five ADC loans and one raw land loan (collectively, the "Loan Transactions") — approved between May 15, 2005, and December 6, 2007.

## II.

## PARTIES

### A. Plaintiff FDIC-R

6. Plaintiff, Federal Deposit Insurance Corporation, brings this case in its capacity as Receiver for American Marine Bank, pursuant to its authority granted by 12 U.S.C. § 1821. The FDIC-R was appointed Receiver upon the January 29, 2010 closure of the Bank by the Washington Department of Financial Institutions ("WDFI"). The FDIC-R has the right to pursue all of the Bank's claims, including claims against each of the Defendants herein.

### B. Defendants

The Four Officer and Officer-Director Defendants

7. Defendant Rex Townsend ("Townsend") was the Bank's President, Chief Executive Officer ("CEO"), and a director on the Board of Directors ("BOD") from 1998 until July 16, 2009. Townsend served on the Officers' Credit Committee ("OCC"), the Senior Loan Committee ("SLC"), and Directors' Loan Committee ("DLC") from approximately 1998 until July 16, 2009.

8. Defendant Barbara Kaye ("Kaye") was the Bank's Chief Credit Officer ("CCO") and a member of the OCC and SLC from August 1, 2006, until the Bank failed.

9. Defendant Renzo Lucioni ("Lucioni") was the Bank's Executive Vice-President ("EVP"), Chief Financial Officer ("CFO"), and a member of the OCC and SLC from July 8, 2002, and interim CEO from July 17, 2009, until the Bank failed.

10. Defendant Gary Winter ("Winter") was EVP, CCO, a member of the OCC and SLC from November 8, 2001, and a director from June 2003, until January 31, 2006, when he left the Bank.

11. Townsend, Kaye, Lucioni, and Winter shall hereafter be collectively referred to as the "Officer Defendants."



Law Offices
KARR·TUTTLE·CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

The Six Director Defendants

12. Defendant Bess Alpaugh ("Alpaugh") was a director from 1987 until the Bank failed, Chairman of the Board from March 1997 until April 30, 2009, and a member of the DLC and SLC from 1990 until the Bank failed.

13. Defendant Carl Berg ("Berg") was a director from 1957, and a member of the DLC from 1999 until the Bank failed.

14. Defendant Jeffrey Goller ("Goller") was a director 1989, a member of the DLC from 2002, and a member of the SLC from 2003 until March 15, 2007.

15. Defendant Thomas Kilbane ("Kilbane") was a director from May 17, 2007 and a member of the DLC from August 13, 2007, until the Bank failed.

16. Defendant Andrew Mueller ("Mueller") was a director and a member of the SLC from January 2000 until the Bank failed and a member of the DLC from approximately April 1, 2005, until Bank failure.

17. Defendant Alice Tawresey ("Tawresey") was a director starting from October 19, 2006, and Chairman of the Board from April 30, 2009, until the Bank failed.

18. Alpaugh, Berg, Goller, Kilbane, Mueller, and Tawresey shall hereafter be collectively referred to as the "Director Defendants."

**III.**

**JURISDICTION AND VENUE**

19. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345 because actions to which the FDIC-R is a party are deemed to arise under federal law.

20. The Court has personal jurisdiction over Defendants Townsend, Kaye, Lucioni, Winter, Alpaugh, Berg, Goller, Kilbane, Mueller, and Tawresey, who are, or were, residents of the district in which the Court is situated at all relevant times and/or who at all times conducted the business of AMB in the State of Washington. This Court also has personal jurisdiction over each of the Defendants named in this action pursuant to Revised Code of Washington §§ 4.28.185(1)(a), (b), and/or (c).



*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

21. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the FDIC-R's claims occurred in this district.

## IV.

## FACTUAL BACKGROUND

### A. AMB's Growth Strategy

22. AMB opened for business on September 17, 1948, as a state-chartered bank headquartered in Bainbridge Island, Washington. AMB was founded by a group of Bainbridge Island residents to serve as a deposit institution and residential mortgage lender to service Bainbridge Island residents who, prior to the Bank's opening, were required to ride a ferry to Seattle for their personal banking needs.

23. For several decades, AMB operated in and served the local Puget Sound communities, a relatively limited lending area, as a conservative lending institution focusing primarily on lending within its local island community.

24. In 2004, under Townsend's leadership, AMB embarked on an aggressive, high-risk growth strategy investing in loan participations and opening five new branches, thereby doubling the Bank's branch operations.

25. In his effort to expedite growth, Townsend requested expedited consideration and approval of high-risk ADC participation loans, many of which were poorly collateralized, out-of-area participation loans. On several occasions, Townsend requested that the participation loans be approved without sufficient time to fully analyze appraisals and credit files. In fact, one of the Loan Transactions, the $3 million Western Pennsylvania Senior Living Center loan, was characterized by Defendants Kaye and Lucioni as a loan in which Townsend virtually "crammed down" approval without delegated authority.



Law Offices
KARR·TUTTLE·CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**B. The Director Defendants Ignored and/or Ineffectively Responded to Regulatory Criticism Regarding Loan Underwriting and Loan Concentrations.**

26. As discussed in the 2005 Report of Examination ("RoE") and in each subsequent RoE, examiners noted marked increases in the Bank's adversely classified assets and criticized the Bank's CRE and ADC loan concentrations, identifying less than satisfactory asset quality and weaknesses in credit administration.

27. In 2005, examiners urged the Defendants to implement a loan participation policy to ensure that loan participations were subject to the same due diligence and underwriting as loans originated at AMB and to monitor the markets where the Bank was purchasing participations. Although the Defendants developed a loan participation policy, they failed to comply with it.

28. Despite the regulators' warnings, from 2005 through 2007, the Defendants approved loans: (i) with excessive loan-to-value ("LTV") ratios; (ii) without complete or accurate borrower financial information; (iii) secured by real estate outside of the Bank's primary lending territory; and (iv) to insiders without documentation in the loan file comparing the insider loans to similar loans to the public. Contrary to the Bank's loan policy and prudent banking practices, the Defendants often relied on the value of collateral for repayment instead of the borrower's ability to repay the loan, and they purchased participations without complying with AMB's underwriting standards.

29. In May, July and October 2007, loan officers warned the Defendants that the weakening of the real estate market created potential lending risks. Despite the warnings, as of March 21, 2009, CRE lending had increased by 370 percent and ADC lending had increased by 255 percent. Due to deficient risk management and credit administration condoned by the Defendants, the Bank's condition deteriorated as real estate markets declined.



Law Offices
KARR·TUTTLE·CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

**C. AMB's Loan Policy and Loan Participation Policy**

30. AMB's loan policy, dated October 2005, was amended on November 16, 2006, and periodically thereafter (the "Loan Policy"). AMB's loan participation policy, dated March 2005, was amended in 2006 and 2007, and periodically thereafter (the "Participation Policy").

31. However, the policy provisions relevant to the 11 Loan Transactions were not materially amended and are as follows:

a. The Bank was to avoid high-risk loans;

b. All loans required proper documentation — written applications, current financial statements, credit reports, and tax returns — sufficient to verify a borrower's ability to repay and to verify the strength of the guarantor;

c. All loan decisions had to be based on a thorough understanding and careful consideration of a borrower's financial condition, ability to pay, and credit history;

d. All loan decisions were to be preceded by conservative credit analysis;

e. Demonstrated cash flow was to be the primary source of loan repayment, with collateral providing a secondary source;

f. Purchase of a loan participation required analysis in accordance with AMB's credit standards as if AMB originated the loan itself, including an analysis of collateral quality, review and report analyzing sufficiency of the appraisal, and a thorough analysis of the credit file;

g. The Bank's primary lending area was limited to communities within the Puget Sound area;

h. LTV ratio limits were 65 percent for raw land loans, 75 percent for land development loans, 75 percent for commercial loans, and 80 percent for various residential construction loans;

i. Appraisals were required for all loans over $250,000 and were required to be current (less than a year old), in conformance with the Uniform Standards of



Law Offices
KARR·TUTTLE·CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Professional Appraisal Practice ("USPAP"), and prepared by a state-certified appraiser selected from a list approved by the Bank's Board of Directors; and

j. Credit underwriting for insider loans was to be the same as for public borrowers and required documentation in the loan file comparing the insider loans to similar loans to the public.

**D. AMB's Loan Approval Authorities**

32. The OCC met as needed and had authority to approve loans up to $2 million as of June 2006 and up to $4 million as of September 21, 2007, for borrowers and projects in the Bank's normal trade area in lines of business familiar to Bank management. The OCC was chaired by the CCO, and the President, CFO, and Senior Credit Analyst Supervisor were also standing members of the OCC.

33. The SLC met as needed and had authority to approve loans over $2 million and up to the Bank's legal lending limit as of June 2006, and over $4 million up to the legal lending limit as of September 21, 2007. The SLC consisted of two outside directors, the President, CCO, CFO, and Senior Credit Analyst Supervisor.

34. The DLC met once a month, reviewed the Bank's lending activities, and determined lending strategy for the future. The DLC had the same loan approval authority level as the SLC. Although not specified in the loan policy, the DLC appeared to consist of all directors seated on the Board at the time of voting. The Board of Directors had eight members, met monthly, and had authority to approve all insider loans and other loans up to the Bank's legal lending limit.

**E. Defendants Were in Breach of Their Fiduciary Duties, Grossly Negligent and Negligent by Approving the Eleven Loan Transactions.**

35. The 11 Loan Transactions discussed below were approved by various of the Defendants, notwithstanding serious underwriting deficiencies that violated safe and sound lending practices and the Bank's own Loan Policy.



Law Offices
KARR·TUTTLE·CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

36. Each of the Loan Transactions violated AMB's Loan Policy in numerous respects. Many were made with inadequate appraisals, were based on inadequate financial information, or were made to borrowers without demonstrated earnings and cash flow to evidence an ability to repay the loan. Participation loans were purchased without AMB performing its own independent due diligence, underwriting, or credit analysis. Nevertheless, the 10 Defendants approved the 11 Loan Transactions as noted in the following table:

| The 11 Loan Transactions | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Borrower | Loan Amount ($millions) | Approval Date | Damages ($millions) | Approvals/ Recommendations | | | | | | | | | |
| | | | | Alpaugh | Berg | Goller | Kaye | Kilbane | Lucioni | Mueller | Tawresey | Townsend | Winter |
| 1. Midtown JV | $4.000 | May 17, 2005 | $3.600 | x | x | x | | | | x | | x | x |
| 2. River Canyon | $4.000 | Jan. 6, 2006 | $2.446 | x | | x | | | x | x | | x | x |
| 3. Pacifica | $1.950 | June 14, 2006 | $1.136 | x | x | x | | | | x | | x | |
| 4. Western PA | $3.000 | Dec. 28, 2006 | $0.920 | | | | | | | | | x | |
| 5. Umani | $3.220 | Jan. 29, 2007 | $0.591 | x | | | x | x | x | | | x | |
| 6. Summerhill Est. | $1.406 | May 15, 2007 | $0.347 | x | x | | | | | x | x | x | |
| 7. WCC Tenzen | $5.000 | May 24, 2007 | $3.285 | x | | | x | | x | x | | x | |
| 8. Spanaway 19 | $1.100 | June 18, 2007 | $0.997 | | | | x | | x | | | x | |
| 9. Quincy Street | $1.845 | Aug. 31, 2007 | $0.602 | | x | | | x | | | x | x | |
| 10. Campus Crest | $4.000 | Oct. 24, 2007 | $3.332 | | | | x | | x | | | x | |
| 11. Robert & Brenda's | $3.200 | Dec. 10, 2007 | $0.835 | x | | | x | x | x | | | x | |
| **TOTAL** | **$29.721** | | **$18.091** | | | | | | | | | | |

37. All of the Loan Transactions violated AMB's Loan Policy in numerous respects. Examples of underwriting deficiencies on the 11 Loan Transactions include the failure to verify sources of repayment, verify and analyze financials, analyze cash flow, require sufficient collateral, obtain adequate appraisals, review inventory, and analyze other debt or investments.



*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Midtown Joint Ventures, LLC

38. AMB purchased a $4-million participation in a $16.5-million loan to Midtown Joint Ventures, LLC ("Midtown") through Marshall Bank First. The purpose of the loan was to finance the construction of a mixed-use residential project situated on five assembled land parcels in Orem, Utah. The loan was approved by the Bank on or about May 17, 2005. Loan deficiencies include, without limitation, the following:

a. No thorough analysis of guarantors prior to funding;
b. Loan was "out of territory," the purpose was to construct commercial/retail and residential space in Orem, Utah, a geographic area outside the Bank's normal geographic lending scope and an area with which the Bank was unfamiliar;
c. The amount of the loan exceeded the loan-to-value ("LTV") limitation;
d. AMB purchased the participation without conducting adequate due diligence; and
e. Lack of appraisal analysis prior to funding.

Based upon the above-listed deficiencies, Defendants should not have approved and allowed the Bank to fund the Midtown loan. Defendants' acts and omissions caused damages.

River Canyon Real Estate, LLC

39. AMB purchased a $4-million participation in a $33.5-million loan to River Canyon Real Estate, LLC ("River Canyon") through Marshall Bank First. The purpose of the loan was to finance a new residential land development on 634 acres in Douglas County, Colorado. The loan was approved by the Bank on or about January 6, 2006. Loan deficiencies include, without limitation, the following:

a. Guarantors offered illiquid and limited support compared to the size of the loan;
b. No analysis of, *inter alia*, the feasibility of the project to meet completion and sales deadlines;



*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

c. The purpose of the loan was to finance construction in Douglas County, Colorado — outside the Bank's normal lending area — and in an area with which the Bank was unfamiliar;

d. Purchased participation without conducting adequate independent due diligence; and

e. Inadequate review of a June 2005 amendment to the appraisal.

Based upon the above-listed deficiencies, Defendants should not have approved and allowed the Bank to fund the River Canyon loan. Defendants' acts and omissions caused damages.

Pacifica Construction, LLC

40. The original principal amount of the loan to Pacifica Construction, LLC ("Pacifica") — a limited liability company controlled by Bank director David Berry — was $1.95 million. The purpose of the loan was to finance the construction of a luxury home on Bainbridge Island. The loan was approved on or about June 14, 2006. Loan deficiencies include, without limitation, the following:

a. Given outstanding debt, the speculative nature of the project, and history of cost overruns, borrower's ability to timely repay loan was questionable;

b. Missing personal income and/or expense information from guarantors' personal financial statement;

c. Failure to document Regulation O compliance; and

d. Loan to one borrower violation — the net aggregate (direct and indirect) credit extended to Bank director David Berry from the Bank was approximately $4.664 million.

Based upon the above-listed deficiencies, Defendants should not have approved and allowed the Bank to fund the Pacifica loan. Defendants' acts and omissions caused damages.



Law Offices
KARR·TUTTLE·CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

Western Pennsylvania Senior Living Limited Partnership

41. The Western Pennsylvania Senior Living Limited Partnership ("Western PA") loan was a $4.5-million participation loan. AMB was to be the lead lender of the Western PA loan in the amount of $3 million, and the remaining $1.5 million was to be participated to another bank. The purpose of the loan was to allow borrowers to purchase three mortgages at a 22% discount on the face amount, secured by two assisted-living facilities and raw land in New Stanton, Pennsylvania. Despite the deficiencies discussed below, Townsend "crammed down" this loan and personally wired the funds on or about December 28, 2006, without obtaining loan committee approval.

Loan deficiencies include, without limitation, the following:

a. Risky and unacceptable level of debt service coverage;

b. Inadequate appraisals;

c. Loan was "out of territory" in a geographic area (New Stanton, Pennsylvania) with which the Bank was unfamiliar;

d. Insufficient financial analysis of guarantors' ability to repay loan — the guarantees were circular, as the guarantors' net worth was substantially tied to the very assets being borrowed against; and

e. Loan was funded without having obtained another bank's commitment to participate in loan.

Based upon the above-listed deficiencies, Defendants should not have allowed Townsend to unilaterally fund the Western PA loan without first obtaining the necessary loan documents and/or loan committee approvals. Defendants' acts and omissions caused damages.

Umani, LLC

42. AMB purchased a $3.22-million participation in a $4.32-million loan to Umani, LLC ("Umani") from the Bank of Bellevue. The purpose of the loan was to finance the acquisition of real property in Seattle and the construction of 17 townhome units on the property.



Law Offices
KARR·TUTTLE·CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

The loan was approved by the Bank on or about January 29, 2007. Loan deficiencies include, without limitation, the following:

a. Individual guarantor had limited ability to carry project or reduce loan;

b. Inadequate analysis of projection for timing and sale of units given loan maturation date and the fact the sale of the individual units was the primary source of loan repayment; and

c. The amount of the loan exceeded the LTV limitation.

Based upon the above-listed deficiencies, Defendants should not have approved and allowed the Bank to fund the Umani loan. Defendants' acts and omissions caused damages.

Summerhill Estates, LLC

43. The original principal amount of the loan to Summerhill Estates, LLC ("Summerhill") — a limited liability company controlled by Bank director David Berry — was $1.406 million. The purpose of the loan was to finance the construction of luxury residential "spec" properties. The loan was approved on or about May 15, 2007. Loan deficiencies include, without limitation, the following:

a. Summerhill lacked earnings and cash flow for adequate debt service coverage;

b. The borrower was highly leveraged and had a history of cost overruns on other construction projects;

c. The amount of the loan exceeded the LTV limitation;

d. Insider loan policy violations; and

e. Net aggregate outstanding debt amount of $4.442 million exceeded the "house limit" and constituted a "loan to one borrower" violation.

Based upon the above-listed deficiencies, Defendants should not have approved and allowed the Bank to fund the Summerhill loan. Defendants' acts and omissions caused damages.

WCC Tenzen, LLC

44. AMB purchased a $5-million participation in a $14.848-million loan to WCC Tenzen, LLC ("WCC Tenzen") through First Mutual Bank of Bellevue. The purpose of the loan



Law Offices
KARR·TUTTLE·CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

was to provide financing for a 72-unit condominium conversion project. The loan was approved by the Bank on or about May 24, 2007. Loan deficiencies include, without limitation, the following:

a. Guarantor's net worth was primarily illiquid assets;

b. Inadequate review of underlying financial information and project feasibility;

c. The amount of the loan exceeded the LTV limitation;

d. Inadequate appraisal review; and

e. $5-million loan exceeded $4-million "house limit."

Based upon the above-listed deficiencies, Defendants should not have approved and allowed the Bank to fund the WCC Tenzen loan. Defendants' acts and omissions caused damages.

Spanaway 19, LLC

45. The original principal amount of the loan to Spanaway 19, LLC ("Spanaway") was $1.1 million. The purpose of this loan was to allow borrower to "cash out" on the land in order to obtain working capital for various real estate partnerships. The loan was approved by the Bank on or about June 18, 2007. Loan deficiencies include, without limitation, the following:

a. Evident borrower lacked any earnings/cash flow to service debt given borrower was merely cashing out equity from raw land;

b. No environmental report obtained and/or located in loan file; and

c. The amount of the loan exceeded the LTV limitation.

Based upon the above-listed deficiencies, Defendants should not have approved and allowed the Bank to fund the Spanaway loan. Defendants' acts and omissions caused damages.

Quincy Street at the Waterfront, LLC

46. The original principal amount of the loan to Quincy Street at the Waterfront, LLC ("Quincy Street") was $1.845 million. The purpose of the loan was to refinance a $686,000 AMB loan to Quincy Street, pay off a $135,000 First Deed of Trust held by Verity Credit Union, retire $354,000 in liens on the project, and fund $541,259 to complete construction of residential



Law Offices
KARR·TUTTLE·CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

units and commercial space. Of the loan amount, $263,741 was used to pay loan fees and interest. The loan was approved by the Bank on or about August 31, 2007. Loan deficiencies include, without limitation, the following:

a. Borrower lacked cash flow to support debt and had no experience as a developer;

b. Guarantor had a subpar FICO score, a history of failed businesses, was subject to a $1-million IRS lien, and lacked sufficient cash flow to repay loan in the event of borrower default;

c. Loan was approved despite inadequate financial information as the borrower's financial information was not verified; and

d. The amount of the loan exceeded the LTV limitation.

Based upon the above-listed deficiencies, Defendants should not have approved and allowed the Bank to fund the Quincy Street loan. Defendants' acts and omissions caused damages.

<u>Campus Crest Properties, LLC</u>

47. AMB purchased a $4-million participation in the $16.5-million loan to Campus Crest Properties, LLC ("Campus Crest") from Rainier Pacific Bank. The purpose of the loan was to provide acquisition and development financing for 114 single-family lots in Federal Way, and to provide funds to pay off an underlying bank loan and complete the project. The loan was approved by the Bank on or about October 24, 2007. Loan deficiencies include, without limitation, the following:

a. Borrower lacked earnings and cash flow to support debt and had recently emerged from bankruptcy;

b. Inability of guarantor to repay loan: a noted repayment source in the credit memorandum was questionable. Guarantor's personal guarantee of the loan was ordered by a court after the guarantor had reneged on a loan commitment



Law Offices
KARR·TUTTLE·CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

for the subject project, and guarantor's assets consisted largely of illiquid real estate;

c. Missing/inadequate financial information;

d. The amount of the loan exceeded the LTV limitation; and

e. Inadequate appraisal review.

Based upon the above-listed deficiencies, Defendants should not have approved and allowed the Bank to fund the Campus Crest loan. Defendants' acts and omissions caused damages.

Robert & Brenda's Spokane, LLC

48. The original principal amount of the loan to Robert & Brenda's Spokane, LLC ("Robert & Brenda's") was $4 million. The purpose of this loan was to refinance an outstanding AMB loan in order to permit the borrower to complete construction of a neighborhood retail center. The loan was approved by the Bank on or about January 6, 2006. Loan deficiencies include, without limitation, the following:

a. Borrower's earnings and cash flow to service the loan were highly speculative and based upon prospective leasing of the units on the yet-to-be-completed project property;

b. Lack of analysis/discussion regarding conflicting statements concerning estimate of time to complete project — especially relevant given that the project had experienced construction and completion delays;

c. Missing/inadequate financial information; and

d. The amount of the loan exceeded the LTV limitation.

Based upon the above-listed deficiencies, Defendants should not have approved and allowed the Bank to fund the Robert & Brenda's loan. Defendants' acts and omissions caused damages.



Law Offices
KARR·TUTTLE·CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

## IV.

## CAUSES OF ACTION

### COUNT I – BREACH OF FIDUCIARY DUTY (Against All Defendants)

49. Plaintiff incorporates herein by reference all of the foregoing paragraphs of this Complaint as though fully set forth herein.

50. As directors and officers, Defendants owed a fiduciary duty to AMB to act with the utmost care and in the best interests of the Bank.

51. Defendants breached their fiduciary duties to the extent that they voted to approve, ratify, or renew one or more of the Loan Transactions identified in the chart at paragraph 36 above, by, among other things:

a. Causing the Bank to make, *inter alia*, ADC and CRE loans without proper analysis of borrowers' ability to repay them;

b. Failing to inform themselves about the risk the Loan Transactions posed to the Bank before they approved the Loan Transactions;

c. Approving certain of the Loan Transactions with terms that were inconsistent with the Bank's Loan Policy;

d. Failing to ensure that the Loan Transactions were underwritten in a safe and sound manner prior to approval;

e. Failing to ensure that the Loan Transactions were secured by sufficiently valuable collateral to prevent or minimize the risk of damage to the Bank;

f. Failing to ensure that the Loan Transactions did not violate applicable banking regulations or create unsafe and unsound concentrations of credit; and

g. Failing to inform themselves about the risk the Loan Transactions and/or Insider Loans posed to the Bank before they approved or ratified certain of them;



Law Offices
KARR·TUTTLE·CAMPBELL
A Professional Service Corporation
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

52. As directors and officers, the Defendants owed fiduciary duties of due care and loyalty to AMB to put the interests of the Bank and its depositors above their own at all times.

53. Defendants breached their fiduciary duties by, among other things, approving the Loan Transactions without ensuring they met the appropriate standards, including those identified in paragraphs 36 through 48 above.

54. As a direct and proximate result of Defendants' breach of fiduciary duties, the FDIC-R, as Receiver for AMB, suffered damages in an amount to be proven at trial.

**COUNT II – GROSS NEGLIGENCE UNDER FIRREA**
**(Against All Defendants)**

55. Plaintiff incorporates herein by reference all of the foregoing paragraphs of this Complaint as though fully set forth herein.

56. This is an action for damages against all Defendants under the Financial Institutions Reform, Recovery and Enforcement Act of 1989, codified at 12 U.S.C. § 1821(k), *et seq*. ("FIRREA"), for their gross negligence as directors and officers.

57. Section 1821(k) of FIRREA holds directors and officers of financial institutions personally liable for damage to the institution caused by their "gross negligence," as defined by applicable state law. Gross negligence does not mean the total absence of care, but it is negligence substantially and appreciably greater than ordinary negligence.

58. As loan committee members, officers and/or directors, Defendants owed AMB a duty of care to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances.

59. Defendants were negligent by, among other things, their acts, errors, and omissions set forth in Paragraphs 36 through 48.

60. In addition, Defendants were grossly negligent by voting to approve one or more of the loans identified in the chart in Paragraph 36 above, because they knew each such loan involved one or more of the following characteristics, which increased the risk of default:



*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

a. An excessive LTV ratio, as measured by applicable regulatory standards and AMB's own Loan Policy;

b. A deficient or incomplete appraisal, or an appraisal that deemed the project unfeasible and/or more risky given the softening real estate market;

c. A borrower or guarantor (or both) with excessive liabilities, or who otherwise lacked the financial wherewithal to service the loan;

d. Insufficient proof of pre-sales and/or necessary market demand; or

e. Insufficient collateral.

61. As a direct and proximate result of Defendants' gross negligence, the FDIC-R, as Receiver for AMB, suffered damages in an amount to be proven at trial.

62. Each of the Defendants is liable to the FDIC-R for the damages incurred in connection with his or her tortious conduct relating to the Loan Transactions the Bank funded and other relief as more fully set forth in the Prayer for Relief.

**COUNT III – NEGLIGENCE UNDER WASHINGTON LAW**
**(Against All Officer Defendants)**

63. Plaintiff incorporates herein by reference all of the foregoing paragraphs of this Complaint as though fully set forth herein.

64. During all relevant times, defendants Townsend, Lucioni, Kaye and Winter were officers of the Bank and members of the OCC and/or SLC.

65. As loan committee members and Bank officers, the Officer Defendants owed AMB a duty of care to conduct its business consistent with safe and sound lending practices, and to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances. These duties included, but were not limited to, the following:

a. To inform themselves about proposed loans and the risks the loans posed to the Bank before they approved them;

b. To approve loans that conformed with the Bank's Loan Policy;



*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

c. To ensure that any loans they approved were underwritten in a safe and sound manner;

d. To ensure that any loans they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of damage to the Bank; and

e. To ensure that any loans they approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

66. The Officer Defendants breached their duties and were negligent by, among other things, the acts, errors and omissions set forth in paragraphs 36 through 48 above.

67. As a direct and proximate result of these Defendants' negligence, the FDIC-R, as Receiver for AMB, suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

The FDIC-R requests that the Court enter judgment on Counts I, II, and III granting the FDIC-R the following relief:

68. Damages in an amount to be proven at trial, including appropriate interest under 12 U.S.C. § 1821(l), against each Defendant for negligence, gross negligence, and breach of fiduciary duty in connection with their tortious conduct relating to each Loan Transaction that AMB funded;

69. Pre- and post-judgment interest and litigation costs against all Defendants; and

70. Such other relief as the Court deems appropriate or necessary.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the FDIC-R demands a jury trial in this case on all issues triable by jury.



*Law Offices*
KARR·TUTTLE·CAMPBELL
*A Professional Service Corporation*
1201 Third Avenue, Suite 2900, Seattle, Washington 98101-3028
Telephone (206) 223-1313, Facsimile (206) 682-7100

DATED this 25th day of January, 2013.

Respectfully submitted,

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for American Marine Bank**

s/ Walter E. Barton
Bruce E. Larson, State Bar No. 6209
Walter E. Barton, State Bar No. 26408
KARR TUTTLE CAMPBELL
1201 Third Avenue, Suite 2900
Seattle, WA 98101
(206) 223-1313
blarson@karrtuttle.com
gbarton@karrtuttle.com

Kathleen M. Balderston, NY Bar #2252534
NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
Telephone: (212) 940-3000
Fax: (212) 940-3111

Attorneys for Plaintiff
Federal Deposit Insurance Corporation, as Receiver for American Marine Bank